## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**RESHANDA DAWN PLUMMER,**

    **Plaintiff,**

**v.**                                            **Case No.: 2:17-cv-03591**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

    **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 13, 14).

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g);

**DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On November 21, 2013, Plaintiff Rashanda Dawn Plummer ("Claimant"), completed an application for DIB, alleging a disability onset date of May 12, 2012 due to "primary hypersomnia, major depressive disorder, hypersomnia, depression, anxiety, [and] personality disorder." (Tr. at 151-57, 193). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 86-90, 94-96). Claimant filed a request for an administrative hearing, which was held on June 28, 2016, before the Honorable Scott Johnson, Administrative Law Judge ("ALJ"). (Tr. at 32-66). By written decision dated August 2, 2016, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from the alleged onset date through the date of the decision. (Tr. at 15-31). The ALJ's decision became the final decision of the Commissioner on May 18, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 10, 11). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 13, 14). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 36 years old on her alleged onset date and 40 years old on the date of the ALJ's decision. (Tr. at 26). She has a Master's degree in Psychology and communicates in English. (Tr. at 39, 192, 194). Claimant previously worked as a psychologist and an adjunct professor. (Tr. at 63).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2018. (Tr. at 20, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since May 12, 2012, her alleged onset date of disability. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "major depressive disorder versus a bipolar disorder, attention deficit – hyperactivity disorder (ADHD), hypersomnia and narcolepsy with cataplexy, obesity, a generalized anxiety disorder, and a borderline personality disorder."

(Tr. at 20-21, Finding No. 3). The ALJ also considered Claimant's hypertension, hyperlipidemia, asthma, and neck and shoulder pain, but concluded that such impairments were non-severe. (Tr. at 21).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). The claimant can climb ramps and stairs occasionally, but she cannot climb ladders, ropes, or scaffolds. The claimant can also balance, stoop, kneel, crouch, and crawl frequently. The claimant, however, needs to avoid all hazards, including moving machinery and exposure to unprotected heights. The claimant can understand, remember, and carry out simple, routine, repetitive tasks in a work environment free of fast paced production requirements and involving only simple, work-related decisions with few, if any, workplace changes. Additionally, the claimant can have frequent interaction with supervisors as well as occasional interaction with co-workers and the public.

(Tr. at 22-25, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform her past relevant work. (Tr. at 25, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 26-27, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date, (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 26, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy,

including work as a dishwasher, hospital cleaner, and laundry worker. (Tr. at 26-27, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 27, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant presents several challenges to the Commissioner's decision, which all focus on her hypersomnia[1] and narcolepsy with cataplexy.[2] First, Claimant contends that the "ALJ failed to conduct a proper step three evaluation of [her] narcolepsy with cataplexy." (ECF No. 13 at 16). Claimant states that the ALJ did not identify any specific listing that he considered regarding her narcolepsy or discuss how the impairment was considered singly or in combination with her other impairments. (*Id.* at 16-17). Claimant contends that although there is no specific listing for narcolepsy, the ALJ should have considered whether her impairment met or was equal in severity to the most closely related listing, which was listing 11.03 for non-convulsive epilepsy. (*Id.* at 17). Claimant argues that the "administrative record clearly demonstrated the existence of evidence related to the criteria of listing 11.03," yet "the ALJ's step three finding was devoid of any analysis" of the probative evidence under listing 11.03. (*Id.* at 17-18).

In her second challenge to the ALJ's decision, Claimant argues that the "ALJ failed to perform a complete function-by-function analysis in forming his RFC assessment." (*Id.* at 8). Specifically, Claimant contends that the ALJ failed to properly evaluate her daytime somnolence and "declined to give any additional RFC limitations that would account for

---

[1] Hypersomnia, or excessive tiredness, is a neurological sleep disorder in which a person has trouble staying awake during the day. https://www.hypersomniafoundation.org/.

[2] Cataplexy is a sudden and uncontrollable muscle weakness or paralysis that is often triggered by a strong emotion, such as excitement or laughter. The loss of muscle tone in cataplexy occurs because of the inability to regulate sleep and awake states -- meaning that elements of each can overlap. https://sleepfoundation.org/narcolepsy/content/cataplexy

this symptom." (*Id.* at 9). Claimant contends that her case is analogous to *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016), in which the United States Court of Appeals for the Fourth Circuit held that "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." (*Id.* at 11-12).

Finally, in her third challenge to the Commissioner's decision, Claimant asserts that the "ALJ's subjective symptoms analysis was not in compliance with regulatory and case law." (*Id.* at 12). Claimant cites that the ALJ "mistakenly stated that he was required to follow the dictates of the now superseded Social Security Rulings (SSRs) 96-7p and 96-4p" instead of the effective Ruling, SSR 16-3p. Claimant further states that "[i]n any event, the ALJ did not follow the required analysis for the rescinded Rulings or SSR 16-3p." (*Id.* at 14). Specifically, Claimant states that "the ALJ did not indicate what objective medical or other evidence he considered or how this evidence undermined [Claimant's] allegations of excessive daytime sleepiness" and that the ALJ failed to build an accurate and logical bridge from "his cursory and inexact summary of the evidence" to his conclusion that Claimant's testimony and allegations were not credible. (*Id.* at 15).

In response to Claimant's challenges, the Commissioner argues that the ALJ specifically considered the applicable listings and explained why Claimant did not meet the "paragraph B" criteria of listings 12.02, 12.04, and 12.08, which all pertain to mental disorders. (ECF No. 14 at 12). As to the fact that the ALJ did not reference listing 11.03, the Commissioner asserts that the ALJ "was not required to consider a listing that [Claimant] did not raise and came nowhere close to meeting." (*Id.* at 13). The Commissioner states that Claimant points to no evidence that could possibly support that

7

she equaled the criteria of the listing, such as documentation that she met the frequency criteria of more than 52 episodes per year (more than once a week) of altered awareness or loss of consciousness, or a significant interference with daily activity. (*Id.* at 12). The Commissioner argues that the "record in this case contains no evidence suggesting that the ALJ should have considered Listing 11.03, and the outcome of this case would not change even if he had." (*Id.*).

Next, the Commissioner argues that the "ALJ accounted for all credible functional limitations from [Claimant's] narcolepsy." (*Id.* at 7). The Commissioner states that the ALJ "clearly identified [Claimant's] exertional, postural, environmental, and mental limitations in his decision." (*Id.*). Further, the Commissioner points out that no doctor opined that Claimant could not work or had limitations beyond those assessed by the ALJ; in fact, one of Claimant's physicians advised that Claimant should take safety precautions when driving and working, which the Commissioner found to indicate that Claimant was able to work. (*Id.*). The Commissioner states that the ALJ assessed limitations in Claimant's RFC beyond what any doctor, even Claimant's own treating sources, suggested, such as no climbing or exposure to hazards and a restriction to simple, repetitive, and routine tasks free of fast-paced production requirements and involving only simple work-related decisions, which the Commissioner argues accounted for Claimant's self-reported difficulty concentrating and becoming easily distracted. (*Id.* at 8). Furthermore, as to Claimant's assertion that the ALJ overlooked her cataplexy, the Commissioner states that Claimant reported only one episode of cataplexy to her physician after her initial visit in October 2013 and the ALJ was not required to include a limitation based upon an isolated event. (*Id.*). Furthermore, the Commissioner argues that the record belies Claimant's statement that she nodded off and needed to take naps.

8

(*Id.* at 8-9).

Finally, the Commissioner asserts that the ALJ thoroughly considered and discussed Claimant's daytime somnolence. (*Id.* at 10). As to the fact that the ALJ applied SSR 16-3p instead of SSR 96-7p, the Commissioner contends that the main change in the Ruling was to eliminate the term "credibility" to better track the language in the regulations and clarify that a claimant's subjective symptom evaluation is not an examination of a claimant's character. (*Id.* at 11). The Commissioner states that the methodology among the rulings is quite similar and Claimant cannot show any harm that would have changed the ALJ's decision. (*Id.*).

## V.  **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A.  **Treatment Records**

Claimant saw her primary care physician, Bradley Willis, M.D., approximately every three months from August 2011 through June 2012. (Tr. at 308-14). Her diagnoses included, *inter alia*, ADHD and hypersomnia, which were treated with Adderall. (*Id.*). However, Claimant was always noted to be alert, fully oriented, and in no acute distress during her visits. (*Id.*).

On October 3, 2013, Claimant presented to psychiatrist, Alexander V. Otellin, M.D., for evaluation of "daytime sleepiness." (Tr. at 340). Claimant reported that she had the issue for years and stated that she also had cataplexy. (*Id.*). On examination, Claimant was calm and fully communicative, but appeared tired. (Tr. at 341). Her mental status examination was otherwise normal. (Tr. at 341-42). Dr. Otellin continued Claimant on Vyvanse and Paxil, decreased her dosage of Valium, discontinued Chantix, and started

Claimant on Ambien. (Tr. at 342).

On October 9, 2013, Claimant saw Lo'ay Al-Asadi, M.D., at Charleston Sleep Solutions, for idiopathic hypersomnolence. Claimant reported that she felt better on Ambien and Paxil, but still had excessive daytime sleepiness. (Tr. at 323). Claimant stated that she was also on Vyvance, but it was not as effective as Adderall. (*Id.*). Dr. Al-Asadi's diagnoses included idiopathic hypersomnolence, excessive daytime sleepiness, and snoring. (Tr. at 324). Claimant was scheduled for a repeat diagnostic polysomnography ("sleep study") and Dr. Al-Asadi advised her to take safety precautions regarding excessive daytime sleepiness when driving and working. (*Id.*). Claimant's sleep study, which was taken two days later, ruled out sleep apnea and periodic limb movements. (Tr. at 321, 325).

On October 23, 2013, Dr. Otellin noted that Claimant still reported excessive fatigue, especially after she had to stop taking Vyvance due to blood pressure issues. (Tr. at 344). Claimant's diagnoses were bipolar disorder and idiopathic hypersomnia with long sleep. (Tr. at 345). Her medications were adjusted, including the addition of the medication Nuvigil.[3] (*Id.*). When Claimant followed up with Dr. Otellin the following month on November 11, 2013, she reported that Nuvigil made her edgy and she felt like she was "speeding up," but it did not keep her awake during the day. (Tr. at 347). Dr. Otellin increased Claimant's dosage of Paxil, discontinued Nuvigil, and started Claimant on Adderall. (Tr. at 348).

During Claimant's next visit with Dr. Otellin on December 3, 2013, Claimant described that she experienced loss of muscle tone during a strong laugh, which Dr.

---

[3] "Nuvigil is a prescription medicine used to improve wakefulness in adults who are very sleepy due to one of the following diagnosed sleep disorders: narcolepsy, obstructive sleep apnea (OSA) [,...and] shift work disorder (SWD)." https://www.fda.gov/downloads/Drugs/DrugSafety/UCM231717.pdf

Otellin found to be "clear episodes of cataplexy." (Tr. at 350). Dr. Otellin noted that on her recent sleep study, Claimant's "sleep latency during MSLT was >5 however it [did not] matter because of the clear history of narcolepsy." (*Id.*). Other than cataplexy, Claimant denied any other issues on her review of systems. (Tr. at 350-51). Claimant was continued on Adderall, her dosage of Paxil was increased, and she was started on Xyrem.[4] (Tr. at 351).

On March 27, 2014, Claimant advised Dr. Otellin that she had no episodes of cataplexy. (Tr. at 353). However, her sleep difficulties were unchanged. (*Id.*). Claimant's mental status examination showed no gross abnormalities and she was continued on her current treatment plan. (Tr. at 354). However, in her subsequent two visits with Dr. Otellin, Claimant's medications required adjustment. On May 27, 2014, Dr. Otellin discontinued Claimant's Adderall because it raised her blood pressure. (Tr. at 356-57). On July 24, 2014, Claimant told Dr. Otellin that she thought that she needed more Xyrem or another sleep study because the first dose did not make her sleepy anymore and she was instead sleepier during the day. (Tr. at 359). Dr. Otellin increased Claimant's dosage of Xyrem. (Tr. at 360).

On September 25, 2014, Claimant told Dr. Otellin that the new dose of Xyrem worked "perfect" and she got a part-time job teaching and had no problems at work and was doing fine. (Tr. at 362). Dr. Otellin added a diagnosis of narcolepsy with cataplexy, without hypocretin deficiency, to Claimant's diagnosis of idiopathic hypersomnia with long sleep. (Tr. at 363). Claimant's diagnosis of bipolar disorder was changed to major

---

[4] Xyrem "is a prescription medicine used to treat the following symptoms in people who fall asleep frequently during the day, often at unexpected times (narcolepsy): suddenly weak or paralyzed muscles when they feel strong emotions (cataplexy) [and] excessive daytime sleepiness (EDS) in people who have narcolepsy." https://www.xyrem.com/.

depressive disorder, and the condition was noted to be improved. (Tr. at 362-63). Dr. Otellin renewed Claimant's prescriptions for Paxil and Xyrem. (Tr. at 363).

At Claimant's next appointment with Dr. Otellin on December 23, 2014, Claimant again reported that her dosage of Xyrem worked well. (Tr. at 365). She stated that she was alert and needed naps "only sometimes." (*Id.*). Thus, Claimant's treatment plan was continued. (Tr. at 366). However, on March 26, 2015, Claimant reported to Dr. Otellin that she was sleepier and more depressed since her ex-husband gained custody of her nine-year-old daughter the preceding month. (Tr. at 391). Claimant's diagnoses remained the same except that Claimant was additionally diagnosed with Attention Deficit Hyperactive Disorder, Inattentive type. (*Id.*). Claimant was continued on Paxil and Xyrem and she was started on Strattera. (*Id.*).

Claimant followed up with Dr. Otellin on May 26, 2015 and reported that she had a significant orthostatic reaction from Strattera and she discontinued the medication, but two weeks later she became anergic and depressed. (Tr. at 395). She was to continue Paxil and Xyrem and resume Strattera. (Tr. at 396). At her following visit on July 9, 2015, Claimant told Dr. Otellin that she was taking a lower dose of Xyrem because she was "low on it," but that she was "ok" when she took a two-hour nap during the day. (Tr. at 404). Claimant's prescriptions for Paxil, Xyrem, and Adderall were renewed, but Strattera was discontinued. (Tr. at 405).

On July 28, 2015, Claimant presented as a new patient to cardiologist, Tracy Paeschke, M.D., Claimant reported a history of suddenly falling asleep and complained of feeling tired much of the time. (Tr. at 424). Dr. Paeschke recommended repeating Claimant's sleep study because she was at a high risk for sleep apnea based on her weight. (Tr. at 427).

On July 31, 2015, Claimant saw Dr. Al-Asadi for the first time since October 2013. (Tr. at 414). Claimant was noted to be taking Xyrem for possible narcolepsy with cataplexy and was "doing great." (*Id.*). However, Claimant still reported excessive daytime sleepiness and snoring. (*Id.*). On August 14, 2015, Claimant had a follow-up diagnostic sleep study, which was negative for obstructive sleep apnea, but did show primary snoring. (Tr. at 412). Dr. Al-Asadi diagnosed Claimant with narcolepsy and primary snoring. (Tr. at 413). Claimant was advised to continue taking Xyrem. (*Id.*). Claimant followed up with Dr. Otellin on September 9, 2015, December 17, 2015 and April 12, 2016. She was continued on medications including Paxil, Xyrem, and Adderall. (Tr. at 430-38).

### B. Opinion Evidence

On May 16, 2014, Claimant had an adult mental status examination performed by psychologist, Lester Sargent, M.A. It was noted that Claimant drove 50 miles to the interview. (Tr. at 332). When asked why she was applying for benefits, Claimant mentioned numerous issues, including narcolepsy with cataplexy. (Tr. at 333). She told Mr. Sargent that in May 2012, she was fired from her last job as a supervised psychologist at a prison because she became involved in a relationship with an inmate. (*Id.*). Claimant reported "irresistible attacks of sleep that occurred frequently during the course of the day and episodes of cataplexy." (*Id.*). Claimant reported that she typically woke up at 8:00 a.m. and took her medications. (Tr. at 336). Claimant then returned to bed, slept, woke up again, and ate breakfast. (*Id.*). Claimant could perform all basic self-care duties without assistance and performed household chores, including cooking, laundry, doing dishes, and sweeping. (*Id.*). Claimant also went outside to smoke cigarettes, watched television, occasionally crocheted, played internet games, maintained scheduled appointments, saw her boyfriend monthly, and saw her eight-year-old daughter on

weekends. (*Id.*).

On July 28, 2014, Amy Wirts, M.D., evaluated Claimant's physical RFC based upon a review of her records. Dr. Wirts noted that Claimant had idiopathic hypersomnolence with "long sleep." (Tr. at 82). Dr. Wirts remarked upon a medical note dated December 3, 2013, which stated that Claimant had clear episodes of cataplexy with loss of muscle tone during a strong laugh. (*Id.*). However, Claimant's medical record dated November 11, 2013 revealed that Claimant had normal muscle strength and tone and normal gait and station. (*Id.*). Also, Claimant's activities of daily living stated that she cleaned, did laundry, performed minor household repairs, mowed, used a weed eater, drove, and shopped. Claimant did not use any ambulatory aids and reported no difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, and using her hands. *(Id.).* Given such evidence, Dr. Wirts opined that Claimant could perform heavy exertional work with frequent postural activities except for occasional climbing of ladders/ropes/scaffolds. (Tr. at 81). In addition, Dr. Wirts found that Claimant should be restricted from concentrated exposure to unprotected heights and machinery. (Tr. at 82).

### C. Claimant's Statements

Claimant testified at her hearing on June 28, 2016 that she took Xyrem and Adderall for narcolepsy and cataplexy. (Tr. at 42). Claimant described that she experienced narcolepsy unlike it was typically portrayed. (Tr. at 45). Claimant stated that she did not fall asleep instantly but could "feel the tiredness coming on" and would lay down. If she did not anticipate it, she was usually already seated anyway; thus, Claimant explained that she had not suffered any accidents or injuries from the condition. (Tr. at 45). Claimant testified that four to five days per week, she had to return to bed within hours of waking to sleep for two hours. (Tr. at 53). In terms of her cataplexy, Claimant

stated that as she was falling asleep, it felt like someone was holding her down and she could not move. (Tr. at 58). However, it did not happen often and there were times when she went a year without it happening. (Tr. at 58-59). Claimant also had an episode of cataplexy brought on by laughing hysterically at her friend. (Tr. at 59).

Claimant testified at the hearing that she had just returned from a week-long trip to a beer and wine festival at "Carolina Beach," which was a "six hour plus trip" and she mostly slept in the back seat and could not drive for more than an hour at a time. (Tr. at 46, 55). She had to "come back and sleep" for at least two hours during the day while on vacation. (Tr. at 53). Claimant acknowledged that she went back to college as a full time electrical engineering student from fall 2012 through spring 2013 and maintained a 4.0 grade point average. (Tr. at 49-50). However, she testified that "there were times" that she had to sleep in her professor's office between classes and could not drive to class because she did not feel safe to drive. (Tr. at 56). Claimant was employed as an adjunct professor at a community college in 2014 to 2015 and taught introduction to psychology. (Tr. at 40-41). Claimant stated that there were times that she had to sleep in her professor's office after teaching before she could go home. (Tr. at 56-57). Claimant further stated that she nodded off while counseling clients before and that one of the reasons she lost primary custody of her daughter was that her daughter was missing school because Claimant was sleeping. (Tr. at 59-60).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial

evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.    Discussion**

### A. Step Three Analysis

In her first challenge to the Commissioner's decision, Claimant contends that the "ALJ failed to conduct a proper step three evaluation of [her] narcolepsy with cataplexy." (ECF No. 13 at 16). Claimant states that the ALJ did not identify any specific listing that he considered regarding her narcolepsy or discuss how the impairment was considered singly or in combination with her other impairments. (*Id.* at 16-17). Claimant contends that although there is no specific listing for narcolepsy, the ALJ should have considered whether her impairment met or was equal in severity to the most closely related listing, which was listing 11.03 for non-convulsive epilepsy. (*Id.* at 17). Claimant argues that the "administrative record clearly demonstrated the existence of evidence related to the

criteria of listing 11.03," yet "the ALJ's step three finding was devoid of any analysis" of the probative evidence under listing 11.03. (*Id.* at 17-18).

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, (1990). Because the listed impairments presume disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that

17

the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, '"insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings."' *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three

determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made is impossible for a reviewing court to evaluate whether substantial evidenced supported the ALJ's findings. *Radford*, 734 F.3d at 295. However, the Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id.* Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 Fed. Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole

demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

Here, the ALJ found at step two of the sequential evaluation that Claimant had severe impairments of "major depressive disorder versus bipolar disorder, attention deficit – hyperactivity disorder (ADHD), hypersomnia and narcolepsy with cataplexy, obesity, a generalized anxiety disorder, and a borderline personality disorder." (Tr. at 20-21). The ALJ specifically considered sections 12.02, 12.04, and 12.08 of the Listing, which concerned organic brain disorders, affective disorders, and personality disorders, respectively. The ALJ considered Claimant's activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace; ultimately, although the ALJ found that Claimant had limitations related to her psychological disorders, the ALJ concluded that Claimant did not have any impairment or combination of impairments that met the Listing. (Tr. at 21-22).

Claimant contends that the ALJ's step three analysis was deficient because it "was completely silent" regarding her narcolepsy with cataplexy that the ALJ found to be a severe impairment. (ECF No. 13 at 17). Claimant argues that the ALJ should have compared the signs and symptoms of her narcolepsy with cataplexy to the most closely

analogous listed impairment, listing 11.03, which concerned non-convulsive epilepsy. As noted by Claimant, listing 11.03 is no longer in effect. However, at the time of the ALJ's decision, listing 11.03 required documentation of a "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.03. Following the ALJ's decision in this case, the Social Security Administration issued Program Operations Manual System ("POMS") DI 24580.005, which explains that "[a]lthough narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is" the listing for epilepsy, which is presently listing 11.02. *See* https://secure.ssa.gov/poms.nsf/lnx/0424580005.

Claimant does not point to any evidence or legal precedent to demonstrate that the ALJ was required to explicitly consider listing 11.03 in this circumstance. Although Claimant stated that she had to return to bed for a two-hour nap four to five days per week, the ALJ provided substantial analysis to demonstrate that Claimant's sleep disorders did not significantly interfere with her daily activities of sufficient severity to meet the Listing. As discussed by the ALJ, Claimant cared for her daughter, attended her daughter's sporting events out of town, did chores and cooked basic meals, used a computer regularly, managed her own finances, and went to a beer and wine festival. Claimant even attended college as a full time electrical engineering student from fall 2012 through spring 2013 obtaining a 4.0 grade point average, as well as having taught Introduction to Psychology as an adjunct college professor during 2014 to 2015. (Tr. at

21-23, 25).

"An ALJ is not required to explicitly identify and discuss every possible listing." *Ezzell*, 688 F. App'x at 200. Rather, as noted, an ALJ must "provide a coherent basis for his Step Three determination, particularly where the 'medical record includes a fair amount of evidence' that a claimant's impairment meets a disability listing." *Id.* (citation omitted). In this case, there is not ample evidence that Claimant met or equaled listing 11.03. As the ALJ clearly explained, Claimant's daytime somnolence did not significantly interfere with her daily activities to the extent that it would render her presumptively disabled. Further, as to her cataplexy, Claimant conceded that it did not happen often and there were times she went a year without it happening, which would not meet the frequency requirement of listing 11.03. (Tr. at 58-59).

Therefore, the undersigned **FINDS** that the ALJ's step three analysis and determination is supported by substantial evidence.

### B. Function-by-Function Analysis

In her second challenge to the ALJ's decision, Claimant argues that the "ALJ failed to perform a complete function-by-function analysis in forming his RFC assessment." (*Id.* at 8). Specifically, Claimant contends that the ALJ failed to properly evaluate her daytime somnolence and "declined to give any additional RFC limitations that would account for this symptom." (ECF No. 13 at 9). Claimant contends that her case is analogous to *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) in which the United States Court of Appeals for the Fourth Circuit held that "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." (*Id.* at 11-12).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 404.1545(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has

limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ found that Claimant could perform a limited range of medium work, including frequent postural activities, except that Claimant could only occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds and she could not be exposed to moving machinery and unprotected heights. (Tr. at 22). The ALJ further limited Claimant to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements and only simple work-related decisions with few, if any, workplace changes. (*Id.*). Also, the ALJ restricted Claimant's RFC to occasional interaction with co-workers and the public and frequent interaction with supervisors. (*Id.*).

In crafting Claimant's RFC, the ALJ noted Claimant's diagnosis of hypersomnia, which the ALJ stated caused excessive daytime sleepiness. (Tr. at 22). The ALJ commented that Claimant reported difficulty staying awake during the day and cited Claimant's clinical diagnosis of narcolepsy with cataplexy. (Tr. at 22-23).  Nevertheless,

the ALJ found that despite Claimant's daytime sleepiness, the condition did not impose any additional limitations in her RFC. The ALJ discussed the objective evidence, Claimant's significant daily activities, and noted that Claimant was able to work in the past with the associated fatigue related to her condition. (Tr. at 24-25). Also, the ALJ gave great weight to the RFC assessment of Dr. Wirts, noting that it was consistent with the record as a whole, including the absence of any findings or treatment secondary to sleep related injuries or accidents, and the fact that there were no contrary opinions from any treating or examining sources. (Tr. at 25). However, despite the above analysis, the ALJ never articulated any discussion of what Claimant's limitations were related to her excessive daytime somnolence and whether the impairment imposed any work-related limitations, such as requiring Claimant to take breaks during the workday.

Claimant argues that her case is analogous to the Fourth Circuit's decision in *Monroe*. In *Monroe*, the Fourth Circuit remanded a case, in part, because the ALJ "never made specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur." *Monroe*, 826 F.3d at 188. Rather, the ALJ "simply concluded that Monroe was capable of light work (with the exceptions he identified) and that Monroe's claimed symptoms were 'not credible to the extent they are inconsistent with' the RFC the ALJ identified." *Id.*

Unlike *Monroe*, the ALJ in this case did not commit the critical error of expressing the RFC finding first and then determining whether the evidence was consistent with such limitations. (Tr. at 22-25). However, the undersigned agrees with Claimant that, like *Monroe*, the ALJ's decision with respect to her daytime somnolence falls with the Fourth Circuit precept that "remand may be appropriate where an ALJ fails to assess a claimant's

25

capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Monroe*, 826 F.3d at 188 (quoting *Mascio*, 780 F.3d at 636). While the ALJ acknowledged Claimant's daytime somnolence and provided a thorough discussion of the activities that she was able to perform despite such impairment, the ALJ failed to provide any meaningful analysis of his findings concerning her condition and connect his conclusions to any of the medical evidence in the record. (Tr. at 22-25).

In this case, there is a fair amount of conflicting evidence regarding Claimant's daytime somnolence and, like *Monroe*, the ALJ failed to analyze the evidence and determine the extent of Claimant's daytime fatigue and whether it would require breaks during work. *See Monroe*, 826 F.3d at 188. Claimant testified that she sometimes had to go back to sleep within hours of waking and even after starting Xyrem sometimes still needed to take a nap during the day. (Tr. at 47, 54). Claimant stated that, at times, she needed to sleep between classes when she went back to college and sleep after classes when she taught as an adjunct professor. She testified that she sometimes could not go to class due to her condition and also lost primary custody of her daughter due to her sleep disorder. Further, Claimant stated that even when she was working as a psychologist, she "nodded off" while counseling patients.

The ALJ failed to discuss any of the objective evidence that reflected a clear history of treatment for daytime somnolence. Claimant's treating provider diagnosed her with hypersomnia and treated her with Adderall. (Tr. at 308-14). Claimant was then referred to a psychiatrist for the condition, as well as a physician specializing in sleep medicine in October 2013. (Tr. at 323, 340). Claimant continued to report excessive fatigue and her psychiatrist prescribed the medication Nuvigil. (Tr. at 344-45). Due to reported side

effects, Claimant was switched back to Adderall and Xyrem was added to her medication regimen. (Tr. at 348, 351). In July 2014, Claimant's dosage of Xyrem was increased based upon her reports that her current dose was no longer effective, and she was instead "sleepier" during the day. (Tr. at 359-60). In September 2014, Claimant reported to her treating provider that her new dose of Xyrem worked "perfect" and she had a new job as an adjunct professor; however, at her next appointment in December 2014, although Claimant again confirmed that her dosage of Xyrem worked well, she still needed to take naps sometimes. (Tr. at 365). Claimant was continued on Xyrem with other medication adjustments throughout the remainder of the record. (Tr. at 391, 396, 404-05, 413, 430-31, 433-34).

The ALJ concluded that Claimant had "some difficulties related to daytime sleepiness," but did not identify what the difficulties were and how they affected Claimant functionally. While the ALJ may have appropriately concluded that Claimant did not require any further limitations, the undersigned cannot discern the basis for such finding from the ALJ's decision. In this case, the ALJ found that Claimant had severe impairments of hypersomnia, reportedly causing excessive daytime somnolence, and narcolepsy with cataplexy, yet the ALJ utterly failed to address the medical evidence concerning such impairments and relate the evidence to the RFC finding. The ALJ mentioned that Claimant did not appear to be fatigued looking during examinations, which while generally true, did not reconcile the other evidence such as Claimant's testimony and statements during her examinations and her treatment regarding excessive somnolence and need to take naps during the day. Furthermore, like *Monroe*, the ALJ cited that Claimant's sleep study was positive for sleep apnea and periodic limb movements but did not explain how such results related to the analysis and RFC finding.

Ultimately, because the ALJ never determined the extent of Claimant's sleep disorders and associated functional limitations, the undersigned cannot determine whether the hypothetical question posed to the vocational expert included all of Claimant's functional limitations. *See Monroe*, 826 F.3d at 188. This error is particularly critical because the vocational expert testified that a person with Claimant's characteristics and RFC could *not* work if the person was additionally off task one hour out of an eight-hour workday due to the need to sleep. (Tr. at 64). The expert explained that "a competitive work environment is not set up to you know allow for somebody to take naps or lay down or sleep." (Tr. at 65). The expert stated "[t]hat's just not possible in a competitive work setting." (*Id.*).

Therefore, because the ALJ's RFC discussion lacks a sufficient analysis and explanation for the ALJ's conclusions regarding Claimant's reported hypersomnolence, narcolepsy, and cataplexy and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider or elaborate on the discussion of such impairments and any associated functional limitations.

### C. Subjective Symptom Analysis

In her final challenge to the Commissioner's decision, Claimant argues that the ALJ incorrectly applied SSR 16-3p instead of SSR 96-7p, did not indicate what evidence that he concluded undermined Claimant's allegations of excessive daytime sleepiness, and did not build a logical bridge from his cursory summary of the evidence to his conclusion that Claimant's allegations were not credible. (ECF No. 13 at 12-15).

An ALJ evaluates a claimant's report of symptoms using a two-step process. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2017 WL 5180304, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* § 404.1529(c)(2);

and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2017 WL 5180304, at *4-*7.

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595).

The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2017 WL 5180304, at *5. SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. However, the Ruling provides that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate;" rather, "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time," which "may explain why an individual's statements vary when describing the

intensity, persistence, or functional effects of symptoms." *Id.*

Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *11.

Critically, when considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

As relevant to Claimant's challenge, SSR 16-3p, which was discussed above, rescinded and superseded the prior Ruling, SSR 96-7p. SSR 16-3p, 2017 WL 5180304, at *1. SSR 16-3p eliminated the use of the term "credibility" to track the language of the regulations and clarified that "subjective symptom evaluation is not an examination of an individual's character." *Id.* However, SSR 16-3p did not substantively alter the analysis or methodology of the two-step process. *Keaton v. Colvin*, No. 3:15CV588, 2017 WL 875477, at *6 n.12 (E.D. Va. Mar. 3, 2017); *Sullivan v. Colvin*, No. 7:15-CV-504, 2017 WL 473925, at *3 n.11 (W.D. Va. Feb. 3, 2017).

In this case, the ALJ incorrectly cited SSR 96-7p in evaluating Claimant's subjective complaints, although his decision was made on August 2, 2016, which was after the effective date of SSR 16-3p on March 28, 2016. Such an error could be considered harmless, if the ALJ properly performed the subjective symptom analysis despite applying the rescinded ruling. *See, e.g., Harmon v. Berryhill*, No. 1:17CV417, 2018 WL

1936478, at *8 n. 6 (M.D.N.C. Apr. 24, 2018) (stating that "the ALJ's citation of the rescinded SSR amounts to harmless error, as the ALJ's analysis conformed with SSR 16–3p in that it did not utilize the term 'credibility,' but rather properly considered whether Plaintiff's statements held consistency with the evidence of record.").

However, in this matter, the error is not harmless because it is not clear that the ALJ properly performed the two-step method. The ALJ did not articulate the first step of the analysis to determine whether Claimant's medically determinable conditions could reasonably be expected to produce Claimant's symptoms. Moreover, while the ALJ cited some evidence which the ALJ may have found to cast doubt on Claimant's subjective symptoms of daytime somnolence, such as her daily activities, the ALJ failed to address the substantial relevant evidence from Claimant's treatment records, evaluations, and testimony. The ALJ did not reconcile or discuss most of the evidence concerning Claimant's hypersomnia and certainly did not explain how such evidence factored into the analysis of Claimant's subjective symptoms. Also, as mentioned, the ALJ cited Claimant's sleep study results without any explanation as to how such evidence affected the ALJ's decision. Ultimately, the ALJ did not build a logical bridge from the evidence of record to his conclusions regarding Claimant's subjective symptoms and allegations.

For the above reasons, the undersigned **FINDS** that the ALJ's analysis and findings regarding Claimant's subjective symptoms, particularly regarding her complaints of hypersomnolence, is unclear and frustrates meaningful review of the decision.    Therefore, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** for the additional reason that the ALJ may reconsider, or elaborate on, the discussion of Claimant's reported symptoms.

## VIII.  <u>**Recommendations for Disposition**</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be

provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 17, 2018

Cheryl A. Eifert
United States Magistrate Judge